UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
THOMAS MERKL,                                          :
                                                       :
                          Plaintiff,                   :
                                                       :        **OPINION AND ORDER**
               -against-                               :        09-CV-03085 (DLI)(JMA)
                                                       :
ALLIED BUILDING PRODUCTS, CORP.                        :
and MADELINE BAEZ-WEBER,                               :
                                                       :
                          Defendants.                  :
------------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Thomas Merkl ("Plaintiff") brings this action against defendants Allied Building

Products, Corp. ("Allied") and Madeline Baez-Weber ("Baez-Weber") (collectively,

"Defendants"), alleging violations of the Americans with Disabilities Act of 1990, 42 U.S.C. §

12101 ("ADA"), the New York State Human Rights Law, § 290 ("NYSHRL"), the New York

City Human Rights Law, Administrative Code of the City of New York, § 8 ("NYCHRL"), and

other tortious conduct. (Complaint ("Compl."), Doc. Entry No. 1.) Defendants move for

summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. Plaintiff

opposes the motion. For the reasons set forth below, Defendants' summary judgment motion is

granted.

## BACKGROUND

Allied is a wholesale distributor of building materials, with locations across the United

States. (Cert. of Charles M. Egan III in Supp. of Def.'s Mot. for Summ. J. ("Egan Cert.") ¶ 2,

Doc. Entry No. 15-4.) Plaintiff is a former employee of Allied. (Def.'s Rule 56.1 Statement of

Undisputed Material Facts in Supp. of Def.'s Mot. for Summ. J. ("Def. 56.1") ¶ 50, Doc. Entry

No. 15-1; Pl.'s Rule 56.1 Counter-Statement of Alleged Undisputed Material Facts in Opp. to

Def.'s Mot. for Summ. J. ("Pl. 56.1") ¶ 50, Doc Entry No. 16.)  Plaintiff began working at

Allied's Long Island City Branch on or about August 25, 2003 as an "inside salesperson," which

meant he worked inside Allied's premises, and sold materials and received supply orders over

the telephone.  (Pl. 56.1 ¶ 1; Def. 56.1 ¶ 1; Compl. ¶ 14; Answer ¶ 14, Doc. Entry No. 2.)  For all

relevant times, Baez-Weber was the Assistant Branch Manager of Allied's Long Island City

Branch.  (Pl. 56.1 ¶ 2; Def. 56.1 ¶ 2.)

## A.    Allied's Drug and Alcohol Workplace Policy

For all relevant times, Allied had a company-wide drug and alcohol policy in place.  The

parties dispute what version of the policy was in effect during Plaintiff's employment and

termination.[1]  The following is undisputed.

Volume IV of Allied's Employee Handbook, dated January 2006, included a drug and

alcohol policy ("2006 policy").  (Cert. of Edward G. Bailey in Opp. to Def.'s Mot. for Summ. J.

("Bailey Cert"), Ex. 3 at 31-33, Doc. Entry No. 16-4.)  The 2006 policy stated it was a violation

of company policy:

> "for anyone to report to work under the influence of alcohol or illegal drugs, that
> is with illegal drugs in his/her body.  An employee will be deemed to have tested
> positive and under the influence of alcohol if such employee's blood-alcohol
> content level registers 0.04 or greater."

(*Id.* at 31.)  Furthermore, violation of the 2006 policy "may result in termination."  (*Id.*)  The

2006 policy provided an Employee Assistance Program ("EAP") for employees who tested

positive for being under the influence of alcohol:

> "Any employee . . . testing positive . . . for being under the influence of alcohol
> will be referred to an EAP and must complete any course of treatment or
> rehabilitation recommended by the EAP as a condition of continued employment.
> Continued employment will also be subject to Allied's business needs and will be
> offered only in conjunction with the employee's consent to future random

---

[1] The parties' dispute over which policy was in effect during Plaintiff's employment and termination is not outcome
determinative with respect to Defendants' summary judgment motion.

monitoring.  This avenue shall only apply to the employee's first infraction.  All subsequent infractions shall constitute grounds for immediate termination."

(*Id.* at 32.)

It is also undisputed that Volume V of Allied's Employee Handbook, dated May 2008, included an updated drug and alcohol policy ("2008 policy").  (Bailey Cert, Ex. 11 at 31-35.)  In general, the 2008 policy was quite similar to the 2006 policy, but there were certain relevant differences.  First, the 2008 policy stated it was a violation of company policy: "for anyone to report *or return* to work under the influence of alcohol or illegal drugs, that is with illegal drugs in his/her body."  (*Id.* at 31 (emphasis added).)  Second, the 2008 policy did not specify any particular Blood Alcohol Content ("BAC") as constituting a positive result.  (*Id.*)

Third, a "reasonable suspicion testing" section was added to the 2008 policy, providing:

"Reasonable suspicion must be based on specific contemporaneous, describable observations concerning the appearance, behavior, speech, or body odors of the employee.  Referral for such testing will be made on the basis of facts and circumstances documented by a supervisor who has completed required training, or by a higher level supervisor or manager who has also completed the required training.  A written record will be made of the observations used as the foundation for such a test."

(*Id.* at 32.)

Fourth, pursuant to the 2008 policy, the EAP program was limited to only those employees "who voluntarily request it, where testing of the employee has not been scheduled or requested."  (*Id.* at 33.)  Instead, a Substance Abuse Program ("SAP") was available for those employees, not subject to Federal Department of Transportation laws, who tested positive for illegal drugs or for being under the influence of alcohol.  (*Id.* at 34.)  The SAP program required completion of a treatment or rehabilitation program and provided, as a condition for reinstatement to employment, that:

"All return to duty, random and follow-up tests must be negative in order to continue employment with [Allied] and such employees shall consent to future random and follow-up monitoring by [Allied].

(*Id*.)  The SAP would be available only after an employee's first infraction.  "All subsequent infractions shall constitute grounds for immediate termination."  (*Id.*)

It is also undisputed that Baez-Weber, Roy Renner ("Renner"), the Allied Long Island Branch Manager, and Sergio Gutierrez ("Gutierrez"), the Allied Long Island Branch Operations Manager, participated in an online training course that taught them to identify the symptoms of a person under the influence of alcohol that would give rise to reasonable suspicion testing.  (Pl. 56.1 ¶¶ 8-10; Def. 56.1 ¶¶ 8-10.)

1.  Purportedly Disputed Facts As To Allied's Drug and Alcohol Policy

Plaintiff asserts that "what exactly constituted Allied's policy at any given time is in dispute."  However, Plaintiff attempts to rebut several of Defendants' Rule 56.1 statements only with conclusory statements instead of record evidence.  Such rebuttal is insufficient under Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rule 56.1") and Federal Rule of Civil Procedure 56(c).

Local Civil Rule 56.1 requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. Rule 56.1(a).  Moreover, the party opposing the motion must "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party . . ."  *Id.*  Notably, "[e]ach statement by the movant or opponent . . . *including each statement controverting any statement of material fact*, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Local Civ. Rule 56.1(d) (emphasis added).  Finally, the facts submitted in the movant's statement "will be deemed to be admitted for

purposes of the motion unless specifically controverted by" the opposing party's statement. Local Civ. R. 56.1(c); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]).

Defendants cite to portions of the record and the 2008 policy itself, to assert that it is undisputed that Allied considered a BAC above 0.000 to be a positive test result because the 2008 policy removed the positive BAC threshold of 0.04 set in the 2006 policy. (Def. 56.1 ¶ 4 (citing Cert. of Heather R. Boshak in Supp. of Def.'s Mot. for Summ. J. ("Boshak Cert"), Ex. G, Doc. Entry No. 15-16; *id*, Ex. D, Dep. of Baez-Weber ("BW Tr.") 21; *id.*, Ex. F, Dep. of Douglas Muller ("Muller Tr.") 37, 43-44, 60.) Plaintiff claims that what constituted Allied's policy at any given time is disputed because "Volume IV of Allied's Handbook only defined a reading above .040 as a positive test result." (Pl. 56.1 ¶ 4.) Plaintiff then cites the 2006 policy, but submits no evidence that proves the 2008 policy was not put into effect or that the 0.040 threshold, which was removed from the 2008 policy, was still in effect.

The Court's review of Defendants' citations in support of their Rule 56.1 statement and independent review of the entire record leads to the unavoidable conclusion that, as of May 2008, Allied considered a BAC test result above zero ("0.000") to be positive. *See Vinson v. City of New York*, 2007 WL 965338, at *2 (S.D.N.Y. Mar. 30, 2007) (deeming facts supported by the record and uncontroverted by plaintiff admitted for purposes of a Rule 56 motion).

## B.      Plaintiff's Alcohol Tests

On May 7, 2007, Allied sent Plaintiff for alcohol testing and he registered a BAC of 0.160. (Pl. 56.1 ¶¶ 20-21; Def. 56.1 ¶¶ 20-21; Egan Cert., Ex. E.) Allied informed Plaintiff that, in accordance with its policies, his employment would not be terminated if he completed a

rehabilitation program, and, upon his return to work, he would be subject to testing to ensure compliance with the program. (Pl 56.1 ¶ 22; Def. 56.1 ¶ 22.) Plaintiff attended outpatient counseling for six weeks and returned to work on June 18, 2007, while he continued outpatient treatment. (Egan Cert., Ex. F; Boshak Cert., Ex. C, Dep. of Pl. Thomas Merkl ("Pl. Tr.") 110-13; Pl. 56.1 ¶ 23; Def. 56.1 ¶ 23.)

Upon returning to work, Plaintiff received and signed a performance correction notice dated June 20, 2007 that outlined the terms of his return to work. (Egan Cert., Ex. F; *see also* Pl. 56.1 ¶¶ 23, 25; Def. 56.1 ¶¶ 23, 25.) The June 20, 2007 performance correction notice stated that Plaintiff had been removed from work for violating Allied's substance abuse policy by working under the influence of alcohol, had been sent to treatment, and Allied determined he could return to work while he continued to attend outpatient treatment. (Egan Cert., Ex. F.) The notice provided several conditions for his return to work, including, *inter alia*, that: he must pass a return to duty breathalyzer test; thereafter, he would be subject to random testing; and violation of these terms would result in immediate termination of his employment. (*Id.*)

After his initial return to work breathalyzer test on June 18, 2007, Allied ordered Plaintiff to take a breathalyzer test fourteen times. (Egan Cert. ¶ 6, Ex. C.) Defendants maintain the testing scheme was part of Plaintiff's return to work agreement, which included both random testing and reasonable suspicion testing. (Def. Mem. at 5-6.) Plaintiff argues the testing procedures were designed to "catch him with residual, trace levels of alcohol in his system." (*See* Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. ("Pl. Mem.") at 6, Doc. Entry No. 16. (internal quotation marks omitted).) The random tests were generated and ordered by Allied's Human Resources department and were administered first thing in the morning. (BW Tr. 31-32, 32-33; Boshak Cert., Ex. E, Dep. *de bene esse* of Madeline Baez-Weber ("BW *de*

*bene esse* Tr.") 32, 34; Muller Tr. 30.)  The reasonable suspicion tests were to be ordered by the managers of Allied's Long Island City branch, if they observed signs consistent with alcohol use. (BW Tr. 119; BW *de bene esse* Tr. 32.)

Of the fourteen breathalyzer tests Allied ordered Plaintiff to take, ten of them resulted in a BAC of zero.  (Egan Cert., Ex. C; *see also* Pl. Mem., Appendix A.)  Four of the breathalyzer tests resulted in a BAC above zero, as follows: a BAC of 0.010 on August 27, 2007; a BAC of 0.008 on January 22, 2008; a BAC of 0.037 and 0.033 on March 17, 2008; and a BAC of 0.041 and 0.035 on July 8, 2008.  (Egan Cert., Ex. C; Pl. 56.1 ¶¶ 28, 30, 33, 47; Def. 56.1 ¶¶ 28, 30, 33, 47.)

After the BAC test result of 0.008 on January 22, 2008, Plaintiff received a verbal warning from Baez-Weber that his test results must be zero.  (Pl. Tr. 120, 133; BW Tr. 95, 101; *see* Egan Cert., Ex. J (noting Plaintiff received a verbal disciplinary notice on January 22, 2008 because of the alcohol level in Plaintiff's blood).)  After the BAC test result of 0.037 on March 17, 2008, Plaintiff received and signed a second performance correction notice stating that, because of Plaintiff's substance abuse record with Allied, he must test with a BAC of zero ("0.000") at all times or he would be terminated immediately.  (Egan Cert., Ex. J; Pl. 56.1 ¶¶ 35-36; Def. 56.1 ¶¶ 35-36.)

Plaintiff does not dispute that the March 17, 2008 performance correction notice stated that any further tests with a BAC above zero ("0.000") would result in his termination or that he signed the notice.  (Pl. 56.1 ¶¶ 35, 36; Def. 56.1 ¶¶ 35, 36.)  Instead, Plaintiff maintains that the March 17, 2008 performance correction notice was "contrary to any company-wide policy, *ultra vires* on the part of Baez-Weber, and a continuation to set up Merkl."  (Pl. 56.1 ¶ 35.)  Plaintiff does not cite to any evidence in the record to support his conclusory statement.  The Court's

review of Defendants' citations in support of their Rule 56.1 statement and its independent review of the entire record lead the Court to accept as an undisputed fact that the March 17, 2008 performance correction notice stated that any further test results with a BAC above zero would result in Plaintiff's termination. *See* Local Civ. R. 56.1(c); Fed. R. Civ. P. 56(e)(2); *see also Vinson*, 2007 WL 965338, at *2.

Baez-Weber testified that, on July 8, 2008, she received a complaint from an employee that Plaintiff smelled like alcohol and then Baez-Weber personally observed that Plaintiff smelled of alcohol, had a flushed face, was upset, slammed the phone, and generally appeared irritated and distracted. (Def. 56.1 ¶¶ 37-41.) Plaintiff does not controvert Baez-Weber's testimony, but tries to discredit it by stating that, "ALJ Yorke at the unemployment hearing scoffed at this weak testimony." (Pl. 56.1 ¶¶ 37-41.) Such a conclusory statement, without supporting citations to the record, fails to controvert the testimony pursuant to Local Civ. R. 56.1(c) and Fed. R. Civ. P. 56(e)(2)).)

Baez-Weber then confronted Plaintiff and informed him that he had to take an alcohol test. (Pl. 56.1 ¶ 42; Def. 56.1 ¶ 42.) Plaintiff asked Baez-Weber to have a little "common decency" and hold off sending him for the alcohol test until the afternoon, because he had been out the night before. (Pl. 56.1 ¶¶ 43-44; Def. 56.1 ¶¶ 43-44.) Baez-Weber informed Plaintiff that she could not "look away" and this was part of her job. (Pl. 56.1 ¶ 45; Def. 56.1 ¶ 45.) Plaintiff spoke to Roy Renner ("Renner"), the Allied Long Island Branch Manager, who confirmed he had to take the test. (Pl. 56.1 ¶ 46; Def. 56.1 ¶ 46.) Plaintiff took the alcohol test and registered a BAC of 0.041. (Pl. 56.1 ¶ 47; Def. 56.1 ¶ 47.) Plaintiff was driven directly home. (Pl. 56.1 ¶ 48; Def. 56.1 ¶ 48.) Renner, Baez-Weber, and Allied's Human Resources department, together, decided to terminate Plaintiff's employment. (Pl. 56.1 ¶ 49; Def. 56.1 ¶

49.)  Baez-Weber called Plaintiff on July 8, 2008 to advise him that his employment was terminated.  (Pl. 56.1 ¶ 50; Def. 56.1 ¶ 50.)

## C.    Unemployment Benefits Proceeding

After his termination, Plaintiff filed an application for New York State unemployment benefits.  The Department of Labor issued an initial determination disqualifying claimant from receiving benefits effective July 9, 2008 because Plaintiff "lost employment through misconduct."  (Bailey Cert., Ex. 14 at 1.)  Plaintiff then requested a hearing.  (*Id.*)  At the November 28, 2008 hearing, Allied defaulted.  (*Id.*, Ex. 15 at 2.)  In a December 24, 2008 decision, Administrative Law Judge Paula S. Yorke (the "ALJ") overruled the initial determination and found Plaintiff lost his job under "nondisqualifying conditions."  (*Id.*, Ex. 14 at 2-3 ("[Plaintiff's] last test results were caused by the disease of alcoholism.  Therefore, his conduct does not rise to the level of misconduct.").)  Upon Allied's application, the ALJ reopened the case and held a second hearing on January 7, 2009.  (*Id.*, Ex. 15 at 2.)  Baez-Weber appeared on behalf of Allied.  (Pl. Mem. at 14.)  The ALJ upheld her December 24, 2008 decision.  (Bailey Cert., Ex. 15 at 2-3.)

## DISCUSSION

## A.    Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.*  A

genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation." *Kerzer v. Kingly Mfg.*, 156 F. 3d 396, 400 (2d Cir. 1998). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F. 3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.*, 859 F. 2d 1108, 1114 (2d Cir. 1988)). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. Gen. Motors Corp.*, 758 F. 2d 839, 840 (2d Cir. 1985).

"The Second Circuit has stated that district courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Figueroa v. N.Y. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 227-28 (S.D.N.Y. 2007) (quoting *Schwapp v. Town of Avon*, 118 F. 3d 106, 110 (2d Cir. 1997)) (internal quotation marks omitted). Summary judgment in an employment discrimination case may still be warranted, however, if the plaintiff relies "on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Id.* (citation and quotation marks omitted). "This is because, as the Second Circuit has stated, '[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'" *Id.* (quoting *Meiri v. Dacon*,

759 F. 2d 989, 998 (2d Cir. 1985)).

**B.      Americans with Disabilities Act**

Plaintiff alleges Defendants violated the ADA by refusing to make a reasonable accommodation for his disability and by terminating him because of it. (Compl. ¶¶ 29-32.) The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). Courts apply a burden shifting analysis when considering discrimination claims under the ADA. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Greenway v. Buffalo Hilton Hotel*, 143 F. 3d 47, 52 (2d Cir. 1998). The initial burden is on the plaintiff to present sufficient facts to establish a *prima facie* case of discrimination. *Greeenway*, 143 F. 3d at 52. To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: (a) his employer is subject to the ADA; (b) he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) he suffered an adverse employment action because of his disability. *Brady v. Wal-Mart Stores, Inc.*, 531 F. 3d 127, 134 (2d Cir. 2008) (citing *Jacques v. DiMarzio, Inc.*, 386 F. 3d 192, 198 (2d Cir. 2004)).

The ADA defines "disability" as "(a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* at § 12102(2)(A). "[A] major life activity also includes the operation of a major bodily function, including but not

limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* at § 12102(2)(B).

If a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant, who must articulate "a legitimate, non-discriminatory reason for its actions." *Sista v. CDC Ixis North America, Inc.*, 445 F. 3d 161, 169 (2d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802.) If the employer satisfies this burden, then the plaintiff must prove by a preponderance of the evidence that the defendant's proffered explanation was merely a pretext for discrimination. *Id.* However, where both parties agree that the employer complained of conduct is directly caused by the employee's disability, pretext is not an issue; instead, the employee need only demonstrate that, with reasonable accommodations, he could have performed the essential functions of his job. *McMillan v. City of N.Y.*, 2013 WL 779742, at *7 (2d Cir. Mar. 4, 2013)

C. **Analysis**[2]

Plaintiff alleges he is an alcoholic and thus disabled under the ADA. (Compl. ¶ 27.) He contends Defendants violated the ADA by failing to make reasonable accommodations for his disability and by terminating him because of it. (*Id.* ¶¶ 30, 32.) Assuming, *arguendo*, that Plaintiff has established a *prima facie* case of discrimination under the ADA, as a matter of law Plaintiff cannot make out a claim under the ADA, because: (1) Plaintiff has not established that he requested a reasonable accommodation from his employer; (2) Defendants have proffered a legitimate, non-discriminatory reason for Plaintiff's termination; and (3) Plaintiff has failed to establish that Defendants' proffered explanation is merely a pretext for discrimination. In

---

[2] Plaintiff withdrew his Fourth Claim for negligent hiring, training, retention, and supervision. (*See* Pl. Mem. at 31.) Therefore, Plaintiff's Fourth Claim is dismissed. This opinion addresses Plaintiff's remaining three claims against Defendants.

addition, Plaintiff argues that the Unemployment Insurance Appeal Board's decision precludes Defendants from re-litigating whether Allied terminated him because of his disability, under the theory of collateral estoppel. (Pl. Mem. at 22.) None of Plaintiff's contentions have merit.

### 1. Reasonable Accommodation

Plaintiff alleges that Defendants violated the ADA by failing to make a reasonable accommodation for his alcoholism, because Defendants' testing scheme was unreasonable and designed to "catch him" with alcohol in his system. (Compl. ¶¶ 30-31; Pl. Mem. at 20.) Specifically, Plaintiff maintains Defendants' testing scheme "unreasonably required an 'all zeros' blood reading" and "unreasonably test[ed] [Plaintiff] only immediately after weekends and holidays (such as his birthday and St. Patrick's Day) when [Defendants] knew in all probability that [Plaintiff] would register a residual alcohol reading." (Compl. ¶ 31.) Plaintiff further alleges Defendants "failed to initiate a discussion with [Plaintiff] concerning his need for an accommodation." (*Id.* ¶ 30.)

"Discrimination in violation of the ADA includes, *inter alia*, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F. 3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F. 3d 127, 134 (2d Cir. 2008). To make out a *prima facie* case of disability discrimination arising from a failure to reasonably accommodate, Plaintiff must show the following: "(1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, Plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Graves v. Finch Pruyn & Co., Inc.*, 457 F. 3d 181, 184 (2d Cir. 2006). Thus,

Plaintiff must show that he made a request for a reasonable accommodation that was refused by Allied. *Graves*, 457 F. 3d at 184-85. "This request would matter because, generally, 'it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'" *Id.* (quoting 29 C.F.R. pt. 1630, app. at 363 (2003)).

Plaintiff neither pled in his complaint nor argued in his opposition memorandum that he requested any accommodation from anyone at Allied. The only indication in the record that Plaintiff made a request for an accommodation from Allied was during the morning of July 8, 2008 when Baez-Weber advised him he had to go for a reasonable suspicion alcohol test. Plaintiff asked Baez-Weber to "hold off sending him for the test until the afternoon because he had been out the night before" and "asked [her] to have a little 'common decency,' and let the test go for a couple hours." (Pl. 56 ¶¶ 43-44; Def. 56.1 ¶¶ 43-44.) Such a request is insufficient to make out a claim of discrimination for failure to make a reasonable accommodation, because it is not reasonable. Defendants were under no obligation under the ADA to make accommodations for Plaintiff that would enable his drinking, such as allowing him to come to work with alcohol in his system or be tested at times he preferred that would lead to inaccurate results from the dissipation of alcohol in his system. *Woolcott v. E.I. DuPont de Nemours & Company, Inc.*, 1997 WL 251475, at *4 (W.D.N.Y. Apr. 29, 1997) ("While the ADA, in proper circumstances, protects an individual's status as an alcoholic, it is equally clear that alcoholics are not exempt from reasonable rules of conduct and that an employer need not tolerate an alcoholic's misconduct such as sporadic attendance or on-the-job intoxication.")

Moreover, Defendants did reasonably accommodate Plaintiff. Allied: (1) provided Plaintiff paid leave to attend a rehabilitation program; (2) allowed him to return to work while completing the rehabilitation program on the condition he agree to undergo frequent alcohol

testing; and (3) gave him several opportunities and warnings after he failed several alcohol tests, before ultimately terminating him.

Accordingly, Plaintiff's claim under the ADA for failure to reasonably accommodate his disability fails as a matter of law, as Plaintiff cannot establish the third and fourth of elements of the statute.

2.     Termination

Plaintiff also alleges that Defendants violated the ADA by terminating him because of his disability.  (Compl. ¶¶ 32-33.)  Defendants argue they terminated Plaintiff's employment because his failure to comply with Allied's policies and his last chance agreement constituted "legitimate, non-discriminatory reason[s]" for the termination.  (Def. Mem. at 15.)

Terminating Plaintiff for violating the last chance agreement constitutes a legitimate, non-discriminatory justification for termination.  *See Mayo v. Columbia Univ.*, 2003 WL 1824628, at *6 (S.D.N.Y. Apr. 7, 2003) (plaintiff's termination for failing to meet conditions of return to work agreement, after defendant gave plaintiff leave for alcohol treatment, constituted a legitimate, non-discriminatory reason) (collecting cases from numerous courts in other circuits, similarly holding that a violation of a return to work agreement or last chance agreement constitutes a legitimate, non-discriminatory reason for terminating an employee).  In fact, courts in this circuit have held that termination for infractions far less severe than in the instant case constitute a legitimate, nondiscriminatory reason for termination.  *See  Sedor v. Frank*, 42 F. 3d 741, 746-47 (2d Cir. 1994) (plaintiff's termination due to failure to follow proper procedures or obtain authorization for absence from employment, where the plaintiff had knowledge of the employer's rules regarding documentation of absences, did not constitute discrimination); *Glover v. City Univ. of N.Y.*, 1997 WL 411443, at *4 (S.D.N.Y. July 18, 1997) (no discrimination where

plaintiff's failure to provide the required documentation showing treatment for drug abuse for his medical leave resulted in his termination).

Upon returning to work after commencing rehabilitation treatment, Plaintiff signed the June 20, 2007 performance correction notice that conditioned his return to work on being subject to frequent, random tests. (Egan Cert., Ex. F.) Plaintiff tested with a BAC above zero several times and Allied did not terminate him. (Egan Cert., Ex. C; Pl. 56.1 ¶¶ 28, 30, 33; Def. 56.1 ¶¶ 28, 30, 33.) Instead, Baez-Weber reminded him that he must pass subsequent breathalyzer tests with a BAC of zero. (Def. 56.1 ¶¶ 30, 32 (after a BAC test result of 0.008 on January 22, 2008, Baez-Weber verbally warned Plaintiff that his BAC must be zero); Pl. 56.1 ¶¶ 30, 32; Pl. Tr. 133.) On March 17, 2008, after a BAC test result of 0.037, Plaintiff received and signed a written performance correction notice that stated: "If the employee is tested again and is found with any alcohol level in his blood, he will be immediately terminated. He must test 0.000 at all times." (Egan Cert., Ex. J; *see also* Def. 56.1 ¶¶ 33, 35-36; Pl. 56.1 ¶¶ 33, 35-36.) Allied made it clear that, if Plaintiff failed to maintain a BAC of 0.000 while at work, he would be terminated. Thereafter, Plaintiff was tested with a resulting BAC of 0.041, and as such violated his last chance agreement with Allied. (*See* Pl. 56.1 ¶ 47; Def. 56.1 ¶ 47.) On that day, Allied justifiably terminated Plaintiff.

Plaintiff argues that he failed the July 8, 2008 test because he is an alcoholic and Allied only caught him because Allied was subjecting him to unfair testing procedures because of his alcoholism. "Plaintiff's argument essentially looks past the conduct at issue . . . and contends that Defendant was not motivated to terminate him based on that conduct, but rather based on the condition that generated that conduct – his alcoholism. This approach is incorrect." *Budde v. Kane County Forest Pres.*, 603 F. Supp. 2d 1136, 1142-43 (N.D. Ill. 2009). In *Budde*, the court

found plaintiff was not a qualified individual entitled to protection under the ADA because he was terminated for violating clearly established work rules. "[E]ven assuming that the plaintiff's alcoholism was a partial cause of his drunk driving incident, . . . his drunk driving incident was the sole cause of his termination." *Id.* (internal quotations removed) (citing *Despears v. Milwaukee County*, 63 F. 3d 635, 636 (7th Cir. 1995) (Plaintiff's "alcoholism was not the only cause of his being convicted of drunk driving. Another cause was his decision to drive while drunk.")).

The Court simply cannot disregard the fact that Plaintiff had alcohol in his system at work in violation of his last chance agreement and both the 2006 and 2008 versions of Allied's drug and alcohol policy. Indeed, the uncontroverted evidence shows that Plaintiff's inebriated condition at work was observed by his fellow employees and his conduct created a disturbance in the workplace. Even assuming, *arguendo*, that Plaintiff's alcoholism was a partial cause of his failing the alcohol test, his decision to drink such that he had a BAC of 0.041 while at work was the sole cause of his termination. The record indicates that, in order to have a BAC of 0.041 at ten o'clock in the morning, as Plaintiff did, he needed to have consumed the equivalent of twelve 12-ounce containers of beer between six and eight o'clock in the evening the day before, or consumed three 12-ounce beers at eight o'clock in the morning the day of the test. (Boshak Cert., Ex. I.) In addition, Plaintiff testified he knew he had alcohol in his system and requested that the alcohol test be administered hours later, presumably because, by then, the amount of alcohol in his system would have been lower. (*See* Boshak Decl, Ex. C; Pl. Tr. 50-51 (Plaintiff asked Baez-Weber to hold off the July 8, 2008 alcohol test for a few hours, because "I had a nice breakfast; it would have been gone.") "Simply stated, the ADA does not protect an alcoholic

from the consequences of his misconduct." *Woolcott*, 1997 WL 251475, at *4 (quoting *Williams v. Widnall*, 79 F. 3d 1003, 1007 (10th Cir. 1996)).

When Plaintiff registered a BAC of 0.041 on July 8, 2008, he violated his specific last chance agreement with Allied. In addition, by registering a BAC above 0.04 after receiving leave to attend a treatment program, he violated both the 2006 and 2008 versions of Allied's drug and alcohol policy. (Bailey Cert., Ex. 3 at 32 (under 2006 policy, Employee Assistance Program only available for first infraction); *id.*, Ex. 11 at 34 (under 2008 policy, Substance Abuse Program only available for first infraction).)

### a. Pretext

Plaintiff further claims that Defendants' justification for termination is merely pretext for discrimination because the testing scheme was designed to "trip-up" Plaintiff and catch him with alcohol in his system at work. (Pl. Mem. at 20.) Plaintiff argues the testing scheme was unreasonable because: (1) the testing was not random; (2) the zero BAC threshold was unreasonable; (3) the testing period was open-ended; and (4) there was no predicate for the July 8, 2008 "reasonable suspicion" test that resulted in his termination. Plaintiff cites no case law or evidence from the record to support his claims.

The ADA does not exempt alcoholics from reasonable rules of conduct that apply to all employees. The ADA provides "it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that [a former substance abuser] is no longer engaging in the illegal use of drugs." 42 U.S.C. § 12114(a). Furthermore, an "employer does not discriminate in violation of the ADA by administering tests for the illegal use of drugs to former substance abusers more

frequently than it administers such tests to those not identified as former substance abusers."
*Buckley v. Consol. Edison Co. of N.Y., Inc.*, 155 F. 3d 150, 156 (2d Cir. 1998).

Plaintiff relies on *Drake v. Delta Air Lines, Inc.*, 147 F. 3d 169 (2d Cir. 1998) to argue that Allied's testing scheme was unreasonable because it was not random. However, *Drake* involved a purported violation of plaintiff's fourth amendment rights by drug testing because Delta Airlines allegedly acted under color of state law when it enforced mandatory federal regulations. *Drake* is inapposite and bears no resemblance whatsoever to the present case, which involves neither state actors nor the implementation of federal regulations.

Plaintiff fails to point to any evidence that Allied's testing scheme was not random. The evidence in the record does not corroborate his bald allegations that the testing was designed to "trip up" Plaintiff. After the initial return to work alcohol test, Plaintiff was tested fourteen times. (Egan Cert. ¶¶ 5-6, Ex. B.) Two of those tests were "reasonable suspicion" tests, motivated by complaints by other employees about Plaintiff's appearance and conduct at the workplace. Of the remaining twelve tests, three were administered on a Monday and four were administered on a day following a vacation or sick day. (*Id.*) In just a little over twelve months, between the time Plaintiff returned to work and was terminated, Plaintiff took fifteen vacation days and five sick days. Plaintiff's conclusory allegation that Defendants purportedly targeted Plaintiff to catch him with alcohol in his system is without any basis in fact as reflected by the record before the Court.

Moreover, Plaintiff registered a BAC above zero on three occasions before Allied terminated him. Under the specific circumstances of this case, Allied would have been entitled to terminate Plaintiff after the first positive alcohol test and certainly would have acted properly had Plaintiff been terminated after the second test. Instead, Allied gave Plaintiff additional

opportunities to correct his conduct, address his alleged alcoholism, and gave him a verbal and then written warning that subsequent BAC test results must be above zero or he would be terminated. (Egan Cert., Ex. J; Def. 56.1 ¶¶ 30, 32-33, 35-36; Pl. 56.1 ¶¶ 30, 32-33, 35-36.) These warnings plainly put Plaintiff on notice of Allied's zero BAC policy, before the July 8, 2008 test. (*See, e.g.*, Pl. Tr. 133.) Yet, Plaintiff remained undeterred.

Plaintiff fails to demonstrate the existence of any genuine issue of material fact that Allied's proffered reason for termination was pretext. Therefore, the Court grants summary judgment for Defendants on Plaintiff's ADA claim.

b.      *Collateral Estoppel*

Lastly, Plaintiff argues that, under the theory of collateral estoppel, the decision of the Unemployment Insurance Appeal Board bars Defendants from re-litigating the issue of whether Allied terminated Plaintiff because of his alcoholism. (Pl. Mem. at 22.) Plaintiff maintains that the ALJ's decision in the administrative unemployment proceeding "unequivocally stated . . . [Plaintiff] was terminated on account of his disease." (*Id.*) At the outset, Plaintiff misstates the decision of the ALJ. The ALJ found that, for the purposes of granting *unemployment benefits*, Plaintiff's test results did not constitute misconduct because, "Plaintiff's actions were the result of the disease of alcoholism." (Bailey Cert., Ex. 14 at 2-3.) The ALJ did not find, as Plaintiff claims, that Plaintiff was terminated because of his alcoholism.

Furthermore, the theory of collateral estoppel is not applicable here. New York courts determine whether to apply collateral estoppel using a two-part test: (1) whether the issue to be decided in the second action is identical to the issue necessarily decided in the earlier proceeding and (2) whether the party against whom collateral estoppel is asserted had a full and fair

opportunity to litigate the issue in the earlier proceeding. *Hill v. Coca Cola Bottling Co. of N.Y.*, 786 F. 2d 550, 552-53 (2d Cir. 1986). Neither prong of the test is satisfied here.

First, the issue decided at the Unemployment Insurance Appeal Board proceeding was not identical to the issue before this Court. "[T]he issue before the ALJ and Unemployment Insurance Appeal Board—whether Plaintiff had engaged in misconduct sufficient to disqualify her from receiving unemployment benefits—was distinct from the issue before the Court on Plaintiff's discrimination claim—whether Defendants had articulated a legitimate nondiscriminatory reason for terminating [Plaintiff's] employment." *Liburd v. Bronx Lebanon Hosp. Center*, 2009 WL 1605783, at *4 (S.D.N.Y. June 9, 2009), *aff'd*, 372 Fed. Appx. 137 (2d Cir. 2010).

Second, Allied did not have a full and fair opportunity to litigate the reasons for Plaintiff's termination at the Unemployment Insurance Appeal Board proceeding. "An employer's incentives to litigate a terminated employee's unemployment insurance claims before an administrative law judge are insignificant relative to its incentives to litigate the employee's subsequent federal civil rights action." *Alberti v. County of Nassau*, 393 F. Supp. 2d 151, 168 (E.D.N.Y. 2005) (citing *Gore v. R.H. Macy & Co., Inc.*, 1989 WL 65561, at *3 (S.D.N.Y. June 13, 1989) (finding the liability of the employer is much greater in the civil rights litigation context)). Thus, Allied "did not have a full and fair opportunity to litigate the issue at the prior administrative proceeding" and applying collateral estoppel would be inappropriate. *Id.*

    3.    Claims Under the NYSHRL and NYCHRL

First, claims under the NYSHRL have a parallel analysis as claims under the ADA. *See Kinneary v. City of N.Y.*, 601 F. 3d 151, 158 (2d Cir. 2010) (noting that the "same elements" must be proven to establish ADA and NYSHRL disability claims).

Second, the Court reviews Plaintiff's claims under the NYCHRL under a more liberal analysis than the ADA claims. The NYCHRL "explicitly requires an independent liberal construction analysis in all circumstances, even where State and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling what the statute characterizes as the [NYCHRL's] 'uniquely broad and remedial' purposes, which go beyond those of counterpart State or federal civil rights laws." *Cretella v. Liriano*, 633 F. Supp. 2d 54, 70 (S.D.N.Y. 2009) (quoting *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 70-71 (1st Dep't 2009)). Even assuming, *arguendo*, that Plaintiff has established a *prima facie* case of discrimination under the NYCHRL and viewing the facts in the light most favorable to the Plaintiff, the Court finds that Plaintiff has not satisfied his burden of demonstrating that Allied's proffered reasons for his termination were a pretext for discrimination. This is true even under the more liberal construction of the NYCHRL.

Accordingly, for the same reasons set forth above for Plaintiff's ADA claims, the Court grants summary judgment for Defendants on Plaintiff's claims under the NYSHRL and the NYCHRL.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted and this action is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
      March 28, 2013

/s/
_____
DORA L. IRIZARRY
United States District Judge
